

# ARKANSAS COURT OF APPEALS

DIVISION II
No. CV-15-1054

|  |  |
|---|---|
| BERNSTINE L. COLEMAN (now BULLARD)<br><br>APPELLANT<br><br>V.<br><br>MICHAEL L. COLEMAN<br><br>APPELLEE | Opinion Delivered: JUNE 8, 2016<br><br>APPEAL FROM THE JEFFERSON COUNTY CIRCUIT COURT [NO. DR-04-775]<br><br>HONORABLE LEON N. JAMISON, JUDGE<br><br>AFFIRMED |

## KENNETH S. HIXSON, Judge

Appellant Bernstine L. Coleman (now Bullard and hereinafter "Bullard") appeals the August 10, 2015 "Judgment Order" entered by the Jefferson County Circuit Court, in which she was held in willful contempt of an April 2005 Jefferson County divorce decree. In the 2015 order, Bullard was ordered to be incarcerated in the county jail for twenty days, and she was subjected to a judgment in favor of her ex-husband, appellee Michael L. Coleman (hereinafter "Coleman") in the amount of $143,708. Bullard argues that the trial court erred when it (1) deprived her of due process by holding her in criminal contempt of court without proper notice; (2) imposed an unduly severe punishment of twenty days to serve in the county jail; and (3) awarded an excessive amount of money and awarded it to Coleman instead of the rightful owner, her stepdaughter Olivia Coleman (hereinafter "Olivia"). We affirm.

SLIP OPINION

## I. *Introduction*

Coleman has a daughter from a previous relationship, Olivia, who was born in 1996. Olivia's mother died in an industrial accident at an International Paper facility when Olivia was very young. As a result of her mother's death, Olivia was awarded workers' compensation benefits and social security benefits. The workers' compensation award appears to have been in the form of a $75,000 lump sum payment and biweekly payments of $714 until she reached majority.[1] Those payments began in 1999.

Sometime after the death of Olivia's mother, Coleman married Bullard. Bullard had two children from a prior marriage, and Coleman and Bullard had two children born of their marriage. Coleman, Bullard, and the five children resided together. During this time, the death benefits for Olivia were paid to Coleman.[2] Also during this time frame, Coleman admittedly used a substantial portion of Olivia's funds on "family expenses" and not just for the benefit of Olivia. The record does not indicate the amount of Olivia's money that was spent by Coleman in this manner. Coleman and Bullard divorced in 2005. Bullard received custody of her children from the prior marriage, custody of the two children of their marriage, and custody of her stepdaughter Olivia. As a result of the custody arrangement regarding Olivia, the benefits paid for Olivia were thereafter delivered to Bullard.[3] Coleman

---

[1] The record does not contain a copy of the workers' compensation settlement agreement or precise terms of the settlement agreement.

[2] The record does not contain information on the precise manner in which the payments were made to Coleman for Olivia's benefit; however, Coleman had access to Olivia's funds.

[3] The record does not contain information on the precise manner in which the payments were made to Bullard for Olivia's benefit; however, Bullard had access to Olivia's funds.

SLIP OPINION

believed that, at that time, Olivia's account held approximately $5,000. To protect and preserve Olivia's funds, the 2005 divorce decree contained a paragraph that specifically ordered Bullard not to spend or dispose of the workers' compensation funds or social security funds received for Olivia "without first obtaining an order of the Court."

Bullard took out $2,000 in November 2005 and deposited the money in her own account. In March 2007, Bullard petitioned the court to allow her to use $6,000 of Olivia's money toward the purchase of a house. The circuit court denied the request in a June 2007 trial court order. Bullard did not make any subsequent effort to acquire court permission to use Olivia's funds. Instead, Bullard started making withdrawals from Olivia's account and depositing those funds into her personal bank account "to pay household expenses." Bullard knew that she was required to get court permission, but she admittedly did not because she was afraid that her request would not be approved and would cost her money to hire an attorney to seek approval. Bullard would occasionally make withdrawals from Olivia's account over the years for paying bills, "vacation," "just shopping," "doing different things for the kids," and "just maintaining the household." She admitted that over a nine-year period, she had transferred $143,708 from Olivia's account to her personal account. By the time Olivia reached the age of majority, the balance in Olivia's account was only $21,000. Bullard wrote Olivia a check for $21,000 and closed Olivia's account.[4]

---

[4] Bullard testified the amount of the check was $25,000; Olivia testified the amount of the check was $21,000.

II. *Procedural History*

In February 2015, Coleman filed a motion for contempt and for an accounting, accusing Bullard of failing to obtain a court order prior to spending substantial amounts of Olivia's money. Coleman asked for an order commanding Bullard to reimburse Olivia, to provide a detailed accounting of the funds, and to grant Olivia access to the accounts associated with those funds. Coleman also requested that an order be entered finding Bullard in willful contempt of the 2005 divorce decree. Both Olivia and Coleman verified the motion by providing notarized signatures. Bullard filed a response in March 2015 in which she asked that Coleman be dismissed as an unnecessary party and that Olivia be added as a necessary party because she was at present an adult and because the funds at issue were hers. An Order to Show Cause was filed on April 9, 2015 and served on Bullard setting the contempt hearing for 10:30 a.m. on June 1, 2015 and ordering her to appear and show cause why she should not be found in contempt of court based on Coleman's allegations.

The hearing commenced on June 1. At the outset, the parties stipulated that Olivia was the real party in interest to the funds. Coleman's attorney stated that "it would be form over substance to require her [Olivia] to file a formal pleading to do that." The trial court responded, "So noted." Olivia was, however, never officially named in the caption of the case as a party, nor was Coleman ever dismissed as a party.

Bullard testified that Olivia was placed in her custody at the time of the divorce and remained in her custody until she reached the age of majority. She said that Olivia's benefits commenced in April 1999, and Coleman was the one who received and spent those funds during the marriage. At the time of divorce in 2005, Bullard began to receive benefits for

Olivia every two weeks. The $714 payments were directly deposited into an account designated for Olivia's money.[5] Over the years, Bullard admittedly withdrew a total of $143,708 of Olivia's funds and deposited the money into her personal account.

Bullard testified about her March 2007 attempt to acquire court approval for use of Olivia's money and about the subsequent denial by the trial court. Bullard admitted that she did not seek court approval again to use Olivia's money, although she knew that the decree required her to obtain court consent. Bullard said, "I can't give a definite financial figure of what went directly towards Olivia. I just know all the money was used for the upkeep, maintenance, and care of the family." The family consisted of Bullard, her new husband, and five children, which included Olivia.

Bullard stated that the largest one-time withdrawal she made from Olivia's account was on May 20, 2009, in the amount of $10,000, which she used to buy furniture—a dining room table, a bed, and a mattress. She admittedly took out the following amounts from Olivia's account, as shown on bank statements: $16,000 in May 2009; $27,300 in June 2009; $2,000 in July 2009; $2,500 in August 2009; $2,500 in September 2009; and $7,000 in December 2009. Bullard admittedly used $6,000 of Olivia's money to fill in the in-ground pool in their back yard, explaining that it was too expensive to repair the damages to it. Bullard said that she took the kids on shopping sprees and hosted pool parties for the children and their friends.

When Olivia reached the age of majority, Bullard said that she gave Olivia the money that remained, $25,000, and closed the account. Bullard did not believe that she owed

---

[5] *See* footnote 3.

Olivia any money because, despite admittedly violating a court order, she used the money for Olivia's "care and upkeep," not for her own purposes. She said that she and her husband had jobs, but that if it was necessary to pay Olivia back, she would be willing to get a second job in order to pay her.

Olivia was nineteen years old at the time of the hearing. She testified that when she came of age, Bullard gave her $21,000, not $25,000. Olivia felt that although she "pretty much grew up" in Bullard's home, Bullard treated her differently than the other children; she did not feel loved or treated as well regarding clothing and gifts. Olivia stated that she should be repaid the money and that if jail time was in question, "it would be so." Olivia also testified that she was not attending college because she owed the college $6,000.

Coleman testified that when he and Bullard were married, he had control over Olivia's money and that they used it for the entire household's expenses. Coleman stated that there was no court order regarding how the money was to be spent while he and Bullard were married. He said that he paid child support to Bullard only for the two children born of their marriage.

At the conclusion of the hearing, the trial judge asked Coleman what he was seeking, and his attorney replied that Coleman wanted a $143,708 judgment and the imposition of jail time for Bullard's contemptuous behavior. Bullard's attorney argued that, although she was in violation of a court order, it was not willful and instead just a continuation of the way she and Coleman had operated during the marriage. Bullard's attorney asserted that the trial court had to make a determination of what was "the fair and appropriate thing to do." The trial judge took the matter under advisement.

On August 10, 2015, a "Judgment Order" was filed. The trial court found that Bullard had spent $143,708 of Olivia's money in violation of the 2005 decree and found her "in willful contempt." The order required Bullard to be incarcerated in the county jail for a total of twenty days for her disobedience, allowing her to serve those days when she was not working if that could be arranged with the sheriff's office. The order awarded Coleman a money judgment in the amount of $143,708.

Bullard filed a motion for reconsideration on August 20, 2015, asserting that the trial court erred by finding her in criminal contempt without advance notice that she potentially faced incarceration, such notice being required by due process. Bullard additionally argued that the penalty was "particularly harsh" given Bullard's honesty about her disobedience and the reasons for it. The trial court did not act on this motion. Bullard's timely notice of appeal followed, and in it, she appealed the Judgment Order and the deemed denied Motion for Reconsideration. Only Bullard filed an appellate brief for our consideration.

### III. *The Appeal*

Appellant first argues that her due-process rights were violated by being held in criminal contempt without notifying her that she was potentially facing jail time as a punishment. We disagree that she has demonstrated that she was deprived of due process.

The threshold issue in a contempt case is whether the proceeding was a civil or criminal proceeding. *Bloodman v. State*, 2010 Ark. 169, 370 S.W.3d 174. The critical features that determine the nature of the proceeding are the substance of the proceeding and the character of the relief. *Id.* The purpose of a criminal contempt proceeding is to preserve the power and vindicate the dignity of the court as well as to punish disobedience of its

7

order. *Id.* The characterization of the relief becomes the critical factor in determining the nature of the proceeding for due-process purposes. If the relief provided is a sentence of imprisonment, it is remedial (civil) if the contemnor "holds the keys to the prison" in her pocket by compliance with the court's order, and it is punitive (criminal) if the sentence is limited to imprisonment for a definite period. *Id.* An unconditional penalty is criminal in nature because it is solely and exclusively punitive in character. *Id.* Without question, Bullard's twenty-day sentence to the county jail is punitive in nature and was thus criminal contempt. *See id.*

Arkansas Code Annotated section 16-10-108 (Repl. 2010) on criminal contempt recites that every court of record shall have the power to punish as criminal contempt any person guilty of certain acts that include "willful disobedience of any process or order lawfully issued or made by it." *Id.* at subsection (a)(3). Criminal contempt is classified as a Class C misdemeanor, and punishment is in accordance with that level of offense. *Id.* at subsection (b)(1). Other than in a case where the contempt is committed in the immediate view and presence of the court, which may be punished summarily, a party charged with contempt "shall be notified of the accusation and shall have a reasonable time to make his or her defense." *Id.* at subsection (c). When a person is committed for contempt, the substance of her offense "shall be set forth in the order or warrant of commitment." *Id.* at subsection (d)(1).

Criminal penalties may not be imposed on an alleged contemnor who has not been afforded the protections that the Constitution requires of criminal proceedings. *Bloodman*, *supra.* The due-process clause as applied in criminal proceedings requires that an alleged

SLIP OPINION

contemnor be notified that a charge of contempt is pending against her and that she be informed of the specific nature of the charge. *Id.* Appellant does not argue that she was deprived notice of a pending contempt proceeding based on her alleged willful noncompliance with the divorce decree regarding Olivia's money. Appellant does not argue that she was deprived of an opportunity to defend against being held in contempt for willful disobedience. Appellant argues, instead, that she was not advised that she was potentially facing incarceration as a penalty for criminal contempt, which violated her right to due process. We disagree with her argument.

The standard of review in a case of criminal contempt requires the appellate court to view the record in the light most favorable to the trial judge's decision and to sustain that decision if it is supported by substantial evidence. *James v. Pulaski Cnty. Circuit Court*, 2014 Ark. 305, 439 S.W.3d 19. Substantial evidence is evidence of sufficient force and character that it compels a conclusion one way or another, forcing the mind to pass beyond suspicion and conjecture. *Id.* Our case law, the applicable contempt statute, and constitutional law require only that the alleged contemnor be notified of the accusation and have a reasonable time to make her defense. Ark. Code Ann. § 16-10-108(c); *James*, *supra*. Bullard was clearly provided notice in the April 9, 2015 "Order to Show Cause" that her alleged (and later admitted) failure to abide by the divorce decree regarding spending Olivia's funds subjected her to the possibility of being held in contempt of court. The Order to Show Cause also recited clearly that the matter was to be heard on June 1, 2015 at 10:30 a.m., giving Bullard almost two months in which to prepare a defense. Bullard appeared with her attorney to defend against the motion for contempt, and she testified in her own defense.

SLIP OPINION

In that hearing, Olivia testified that, if jail time was a potential sentence, "it would be so." At the conclusion of the hearing, Coleman's attorney asked for a money judgment and mentioned jail time as a potential consequence. In response, Bullard's attorney asserted only that it was up to the trial judge to determine what was fair and appropriate. Appellant has not provided any compelling authority for her proposition that a notice of a contempt hearing fails to satisfy due process if the notice does not specify the possible sanctions that could be imposed, and we do not impose such a requirement that is beyond what the criminal contempt statute requires. It is abundantly clear that Bullard was afforded due process in this contempt proceeding, and we affirm on this point.

For her second point on appeal, Bullard argues that the penalty of twenty days of jail, to be served on days that she was not at work, was too severe. For a Class C misdemeanor, the maximum sentence of incarceration that could have been imposed was thirty days. Ark. Code Ann. § 5-4-401(b)(3) (Repl. 2013). In contempt cases, the trial court has the discretion to fashion the punishment to fit the circumstances. *Conlee v. Conlee*, 370 Ark. 89, 257 S.W.3d 543 (2007); *Ward v. Ward*, 2014 Ark. App. 261, 434 S.W.3d 923. Here, Bullard admittedly and repeatedly throughout a number of years violated a known order of the trial court. The trial court could have imposed up to thirty days of incarceration, but in its discretion, it imposed twenty days of incarceration. Appellant has failed to demonstrate that the trial court abused its discretion in fashioning this punishment to fit this willful contempt of court. Therefore, we affirm the finding of contempt and the punishment imposed for her willful disobedience.

Bullard next contends that the trial court erred in entering a money judgment in favor of Coleman as opposed to Olivia, given that it was Olivia's money. Bullard also argues that the trial court erred by not reducing the judgment to an amount that takes into account the portions of Olivia's funds that were spent on Olivia. Bullard argues that we should remand to the trial court and order it to amend its judgment accordingly.

We affirm on this point. Bullard did not argue to the trial court that entry of a money judgment in Coleman's favor was erroneous, thus failing to preserve this argument for appellate review. *See Tadlock v. Moncus*, 2013 Ark. App. 363, 428 S.W.3d 526. Bullard's attorney attempted to have Coleman dismissed as a party, but the trial court never ruled on this request. At the hearing, the parties stipulated that Olivia was the real party in interest. Bullard's attorney then stated that it would be form over substance to require Olivia to formally file to enter the case. The trial court's response to this statement was "so noted." The trial court did not officially add Olivia as a party to this contempt action based on a decree between these divorced parties. Olivia is not listed as a party in the caption of the circuit court filings, including the order on appeal. We cannot find error with the trial court entering judgment in favor of the prevailing party of record.

Moreover, Coleman was the proper party to seek to enforce this divorce decree by asking that Bullard be held in contempt. Every action shall be prosecuted in the name of the real party in interest; but a party in whose name a contract has been made for the benefit of another may sue in his own name without joining with him the party for whose benefit the action is being brought. Ark. R. Civ. P. 17(a) (2015). A real party in interest is considered to be the person who can discharge the claim on which the allegation is based,

not necessarily the person ultimately entitled to the benefit of any recovery. *Forrest Constr., Inc. v. Milam*, 345 Ark. 1, 43 S.W.3d 140 (2001). Olivia was a third-party beneficiary to the "contract" (the terms of the divorce decree that pertained to her funds) between Bullard and Coleman. *See Chambers v. Ratcliff*, 2009 Ark. App. 377, 309 S.W.3d 224. A parent has standing to enforce the terms of a divorce decree that are for the benefit of a child, and we have held that a now-adult child is not a necessary party to a contempt action seeking to enforce the terms of a divorce decree. *See id.*

Bullard's final argument on appeal is that the amount of the judgment was erroneous where no "credit" was given for amounts spent on Olivia. We disagree with her and reject this argument. Bullard admittedly spent Olivia's funds without first gaining permission from the trial court, which she knew was a prerequisite to expending *any* of Olivia's funds whatsoever. Even if a "credit" were somehow appropriate, Bullard testified that she was unable to specify how much of the funds were spent directly on Olivia. There was thus no basis on which the trial court could determine a proper "credit."

For the foregoing reasons, we affirm the entry of this Judgment Order.

Affirmed.

ABRAMSON and GLOVER, JJ., agree.

*Robert A. Newcomb*, for appellant.

No response.